IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO.** |
| v. | : | |
| | : | **16-381-1** |
| **GARNET SMALL** | : | |

**MEMORANDUM OPINION**

**Goldberg, J.**                                                                                                         **September 4, 2024**

On March 10, 2022, Defendant Garnet Small was sentenced to 120 months' imprisonment for his offense of possession of a firearm by a convicted felon in violation of §§ 922(g)(1). Small has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255 arguing that: (1) his conviction under § 922(g)(1) violates his Second Amendment right to bear arms, and (2) appellate counsel was ineffective for failing to challenge the Court's finding of probable cause to stop his vehicle for a window tint violation. For the following reasons, I will deny the Motion in its entirety.

**I.      BACKGROUND FACTS**

The following facts are taken from the Pre-Sentence Investigation Report as well as the May 24, 2017 hearing on Small's Motion to Suppress.

On July 20, 2016, Philadelphia police officers David Dohan and Luke Lesko were on patrol in the area of 500 East Walnut Lane in Philadelphia, Pennsylvania. (Notes of Testimony ("N.T.") 5/24/17, at 12–14.) At approximately 8:28 p.m., the officers observed a maroon BMW 6 Series sedan with dark, aftermarket tinted windows. (Id. at 15–16, 64–65.) The officers drove up directly behind the BMW, then stopped at a traffic light, but could not see the occupants due to the tinted windows. (Id. at 16.) When the light turned green, the officers pulled the BMW over. (Id. at 16–17, 65.)

As the officers exited their patrol car to approach the BMW, they observed the driver and passenger side windows roll down. (Id. at 20–21.) Using the rear-view side mirrors, officers observed

the passenger, Defendant Small, lean forward between his feet toward the floorboard before leaning back. (Id. at 21.) When Officer Dohan reached the passenger side window, he noticed Small breathing very rapidly and asked if he was okay, and Small responded in a "nervous," "shaky" voice. (Id. at 22.) Officer Dohan also saw Small playing with the top of a water bottle and keeping his feet "extremely close together" while seemingly trying to push something under the seat. (Id. at 23.) Officer Dohan observed that the object was a black backpack. (Id.) In addition, he remarked that Small, who was a tall man, was sitting with his legs bunched up with his knees touching, despite having plenty of leg room in front of him. (Id. at 23-24.)

At that point, Officer Dohan asked if Small had a gun on him, to which Small replied, "I don't have a gun *on* me," which, to the officer, was a "huge red flag." (Id. at 24.) Officer Dohan then asked if there was a gun in the car. (Id. at 25.) Small replied, "I don't know if there's a gun in the car," paused, and then stated, "but this isn't my backpack," pointing to the floor. (Id. at 25.) Officer Dohan then signaled Officer Lesko, who removed the driver from the car, and then Officer Dohan asked Small for his identification. (Id. at 25–27.) Officer Lesko, having placed the driver in the rear of the police vehicle, then joined Officer Dohan, and together they asked Small to step out of the vehicle and proceed to the rear of the vehicle. (Id. at 28.) While Officer Lesko frisked Small, Officer Dohan reached into the vehicle, retrieved the backpack, and found that it was completely empty except for a single heavy object that was weighing it down. (Id. at 29.) As he felt the bottom of the bag, he noted, without opening the bag, that the object was immediately recognizable as a firearm due to its shape and weight. (Id. at 29–30.)

At that point, Officer Dohan placed the bag on the passenger seat, joined his partner at the rear of the vehicle, and asked Small if he had a permit to carry. (Id. at 30.) When Small replied that he did not, he was placed in custody, and the officers then opened the bag to discover a .380 automatic firearm loaded with seven rounds of ammunition. (Id. at 31.) No motor vehicle citation was issued for the

2

tinted windows on the vehicle based on a police department directive prohibiting citations in situations where a car stop results in the arrest of one of the occupants. (Id. at 35, 58.)

Small's counsel filed a motion to suppress evidence from the car stop. Both officers appeared and testified regarding the events. I denied the motion, finding the officers' testimony credible regarding the excessively dark tinting of the windows, thus giving them reasonable suspicion to stop the car.

On September 20, 2017, Small appeared before me and pled guilty to possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). At the time of his guilty plea, he had several prior criminal convictions, including: four robbery convictions between 1994 and 1996; two separate convictions for possession with intent to deliver a controlled substance in 1999; and convictions for aggravated assault and possessing an instrument of crime in 2003. The pre-sentence report noted that the last prior conviction of aggravated assault in 2003 involved Small shooting the victim in the leg. (Pre-Sentence Investigation Report ¶ 39.)

Small has now filed a Motion to Vacate/Set Aside/Correct Sentence pursuant to 28 U.S.C. § 2255.

## II.  STANDARD OF REVIEW

A prisoner in federal custody may file a motion in the trial court challenging the validity of his sentence under 28 U.S.C. § 2255. This provision reads in relevant part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

Under this statutory framework, a federal prisoner shall be released from custody if the sentence (1) was imposed in violation of the Constitution or laws of the United States; (2) was imposed

3

by a court lacking jurisdiction; (3) was in excess of the maximum authorized by law; or (4) is otherwise subject to collateral attack. United States v. Addonizio, 422 U.S. 178, 180 n.1 (1979) (citing 28 U.S.C. § 2255). To establish a right to habeas corpus relief, a prisoner must demonstrate that the sentence has a "fundamental defect" resulting in a "complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." See United States v. DeLuca, 889 F.2d 503, 506 (3d Cir. 1989).

### III. DISCUSSION

As noted above, Small raises two challenges. First, he asserts that his conviction under 18 U.S.C. § 922(g)(1) violates his Second Amendment rights. Second, he contends that appellate counsel was ineffective for failing to challenge the window tint findings at the suppression hearing.

#### A. Whether Small's § 922(g)(1) Conviction Violates the Second Amendment

Small first argues that § 922(g), as applied to him, is unconstitutional under the Second Amendment, and therefore his conviction must be vacated.

The Second Amendment provides that "[a] well regulated Milita, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., Amend II. Section 922(g)(1) of Title 18 makes it unlawful for "any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1).

The Supreme Court's recent Second Amendment jurisprudence begins with District of Columbia v. Heller, which found a ban on handguns in the District of Columbia to be unconstitutional. 554 U.S. 570, 635 (2008). Heller stated that the Second Amendment protects an individual's right to possess a firearm even if not part of "militia" service but also clarified that this right is "not unlimited." Id. at 626. Specifically, "the right [to bear arms] [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. The Heller Court explained that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession

4

of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626–27.

More recently, in New York State Rifle & Pistol Association v. Bruen, 597 U.S. 1, 42 (2022), the Supreme Court elaborated on the individual right to bear arms.  There, the Court held unconstitutional a state law requiring individuals to "demonstrate a special need for self-defense" in order to carry a handgun in public.  Id. at 38.  In doing so, the Court explained that so-called "means-end scrutiny"—i.e., balancing the strength of the government's interest in regulating against the strength of the individual right infringed—was not a proper analysis in the Second Amendment context.  Id. at 19.  The Court clarified that where the Second Amendment covers an individual's conduct, the government cannot prohibit that conduct except in a manner consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms."  Id.  In his concurrence, Justice Kavanaugh, joined by Chief Justice Roberts, reiterated Heller's statement that prohibitions on the possession of firearms by felons remained "presumptively lawful regulatory measures."  Id. at 81.

Shortly after Bruen, the Third Circuit issued its *en banc* opinion in Range v. Attorney General, 69 F.4th 96 (3d Cir. 2023), vacated by Garland v. Range, 144 S. Ct. 2706 (2024).  There, Range brought a declaratory judgment action seeking to establish that § 922(g)(1) was unconstitutional as applied to him.  Id.  Range was within § 922(g)(1)'s prohibition as he was previously convicted of making a false statement to obtain food stamps, in violation of 62 Pa. Stat. § 481(a).  Applying Bruen, the Third Circuit explained that a firearm regulation violates the Second Amendment if: (1) the text of the Second Amendment applies to the person and the conduct to be regulated, and (2) the Government fails to "affirmatively prove that its firearm regulation is part of the historic tradition that delimits the outer bounds of the right to keep and bear arms."  Range, 69 F.4th at 101 (citing Bruen, 597 U.S. at 19).

After determining that Range was one of "the people" entitled to Second Amendment protection, the Third Circuit found that the Government failed to meet its burden of demonstrating that

§ 922(g)(1), as applied to Range, was "consistent with the Nation's historic tradition of firearm regulation." Range, 69 F.4th at 101–03. In so holding, the court acknowledged that Heller did not "cast doubt on longstanding prohibitions on the possession of firearms by felons." Id. at 103. The court also referenced Justice Kavanaugh's concurrence in Bruen, which reiterated that felon in possession laws are "presumptively lawful." Id. at 103–04. The Third Circuit nonetheless found § 922(g)(1) unconstitutional as applied to "people like Range," who had been found guilty of making a false statement to obtain food stamp assistance, where there was no historical analogue of disarming such non-violent criminals. Id. at 106.

Most recently, in United States v. Rahimi, 602 U.S. ——, 144 S. Ct. 1889 (2024), the Supreme Court endeavored to correct how "some courts have misunderstood" the Bruen standard. See Rahimi, 144 S. Ct. at 1897. Defendant Rahimi challenged a different provision of Section 922(g), one that prohibited him from possessing a firearm because he was subject to a domestic violence restraining order under Texas law. See id. at 1894–95; see also 18 U.S.C. § 922(g)(8). The United States Court of Appeals for the Fifth Circuit credited Rahimi's argument and concluded that the statute did not comport with historical firearm regulations. See United States v. Rahimi, 61 F.4th 443, 460-61 (5th Cir. 2023). The Supreme Court reversed, explaining that its prior precedents "were not meant to suggest a law trapped in amber," but rather "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." Id. at 1897, 1898. The Court recognized the nation's regulatory tradition recognized that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." Id. at 1901.

Given this ruling, the Supreme Court vacated Range "for further consideration in light of United States v. Rahimi." Garland v. Range, 144 S. Ct. 2706 (2024). This development leaves the reach of the Range decision in some flux. What remains settled, however, is the Supreme Court's pronouncement that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." Rahimi, 144 S. Ct. at 1902.

Even assuming <u>Range</u>'s underpinnings remain valid, I find that § 922(g) is valid as applied to Small. There is a long history of laws disarming individuals determined to be dangerous. An English statute empowered the government to "seize all arms in the custody or possession of any person . . . judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. A law from colonial Massachusetts empowered justices of the peace to "seize and take away [the] armour or weapons" of "affrayers, rioters, disturbers or breakers of the peace," among others. An Act for the Punishing of Criminal Offenders (1692), ch. 11, § 6, <u>reprinted in</u> The Charters and General Laws of the Colony and Province of Massachusetts Bay 237, 240 (T. B. Wait & Co. 1814). And a New Jersey law empowered officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess." Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90. These statutes demonstrate that "dangerousness" of some form has long been considered sufficient ground for depriving a person of their right to keep and bear arms.

Robbery has historically been considered a dangerous crime in the United States. As one legal scholar put it:

> The early development and continued existence of a robbery category attests to the recognition by our ancestors that **robbery-like behavior is especially dangerous**. This may be due not only to the recognition that such behavior affects both person and property, but also to the fact that robbery in the early days was often a sudden ambush against a helpless victim on the open road.

Charles Van Court, <u>The Prevention and Control of Robbery, Vol. 5: The History and Concept of Robbery</u> 9 (University of California at Berkeley, 1973) (emphasis added). For instance, in Delaware, it was the case that "[i]f any person [were to] feloniously take from the person of another by violence, or by putting in fear, any money, or other property, or thing, which may be the subject of larceny, he [would] be deemed guilty of robbery and felony." Del. Code. Tit. 20, ch. 127, § 14 (1852), <u>reprinted in</u> Revised Statutes of The State of Delaware 474 (Samuel Kent 1852). It follows, therefore, that the legislature believed that a person who perpetrated a robbery inherently created a danger in carrying out

7

the crime because either actual violence or fear of violence was required for a finding of guilt. In fact, robbery was considered such a threat to an ordered society that, during colonial times, it was considered a felony punishable by death in at least one state. See An Act for the Punishment of Certain Crimes (N.H. 1812), § 11, reprinted in The Laws of the State of New Hampshire 312 (C. Norris & Co. 1815) ("That if any person shall feloniously assault, rob and take from another person any money, goods, chattels, or other property, that may be the subject of theft, such person being thereof convicted, shall be adjudged guilty of felony, and shall suffer death.").

The conclusion that Congress lawfully prohibited Small from possessing a gun is also consistent with the "narrow" holding in Range, where it was held that a person convicted of lying on an application for food stamps may retain their Second Amendment right to keep and bear arms. 69 F.4th at 98, 106. The holding in Range "speaks only to [Range's] situation, and not to those of murderers, thieves, sex offenders, domestic abusers, and the like." Id. at 110 (Ambro, J., concurring). "[Range] stands apart from most other individuals subject to § 922(g)(1)" because "nothing [] suggest[s] he is a threat to society." Id. at 111 (Ambro, J. concurring). 18 U.S.C. § 922(g)(1) remains "presumptively lawful" because "it fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society." Id. at 110 (Ambro, J. concurring).

Unlike Range, who "d[id] not conceivably pose a threat" based on his prior conviction, Small's prior convictions indicate dangerousness. Range, 69 F.4th at 110 (Ambro, J. concurring). Small had four robbery convictions between 1994 and 1996, two separate convictions for possession with intent to deliver a controlled substance in 1999, and convictions for aggravated assault and possessing an instrument of crime in 2003. The last prior conviction of aggravated assault in 2003 involved Small shooting the victim in the leg. Such convictions place Small in the class of people who have been disarmed consistent with the nation's historical tradition of firearm regulation because those who

8

commit robbery and assault have, since the founding, been considered dangerous. Therefore, I conclude that § 922(g)(1) is constitutional as applied to Small.[1]

### B. Ineffective Assistance of Appellate Counsel

Plaintiff next argues that his appellate attorney was constitutionally ineffective for failing to challenge my finding of probable cause to stop his vehicle based on excessive window tint.

Claims of ineffective assistance of counsel are governed by the two-pronged standard enunciated by Strickland v. Washington, 466 U.S. 668 (1984) and its progeny. See Wiggins v. Smith, 539 U.S. 510, 521 (2003) (acknowledging Strickland as the controlling authority). Under the first Strickland prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. Strickland, 466 U.S. at 688, 690. This prong involves two separate inquiries. First, because "[t]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument," a court must look into the substantive merit of the alleged failure. United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999); United States v. Vas, 255 F. Supp. 3d 598, 603 (E.D. Pa. 2017). Second, if the argument that was not raised by counsel has merit, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689.

Under the second Strickland prong, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's error the result would have been different." Strickland, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome."

---

[1] The Government raised three other grounds to challenge this claim: (1) Small's guilty plea waived his right to bring the claim; (2) the claim is procedurally defaulted; and (3) Small does not maintain that he possessed the firearm for a lawful purpose. As I find this claim substantively meritless, I need not address these other arguments.

9

Id. To sustain a plausible ineffective assistance of counsel claim, a petitioner must establish that the attorney's errors were so serious as to deprive the defendant of a fair trial whose result is reliable. See Wells v. Petsock, 941 F.2d 253, 259 (3d Cir. 1991).

Plaintiff contends that appellate counsel's performance fell below the Sixth Amendment standard because he failed to challenge the finding that police had reasonable suspicion—based on alleged unlawful window tinting—to stop the BMW in which he was riding. He claims that there were never any tests or professional inspection of the BMW windows, and, as such, there was no way to determine whether the windows' tint percentage violated 75 Pa. Cons. Stat. § 4524(e)(1).

Any such claim raised on appeal would have been meritless. It is well-settled that a traffic stop is a "seizure" under the Fourth Amendment. See United States v. Johnson, 452 F. App'x 219, 225 (3d Cir. 2011) (citing Whren v. United States, 517 U.S. 806, 809–10 (1996)). The Supreme Court established a "bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for the investigation of some other crime." United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006) (citing Whren, 517 U.S. 806). The "reasonable suspicion" standard applies to routine traffic stops. Johnson, 452 F. App'x at 225. This is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Id. (quoting Illinois v. Wardlaw, 528 U.S. 199, 123 (2000).

The reasonable suspicion analysis does not "deal with hard certainties, but with probabilities." United States v. Cortez, 449 U.S. 411, 418 (1981). "[A]n officer's Fourth amendment burden of production is to (1) identify the ordinary or statute that he believed had been violated, and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possession reasonable suspicion of the alleged infraction. As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination." United States v. Delfin-Colina, 464 F.3d 392, 399–400 (3d Cir. 2006). Thus, where an "objective review of the record evidence establishes reasonable grounds to conclude that the stopped individual has in fact

10

violated [a] traffic-code provision, the stop is constitutional even if the officer is mistaken about the scope of activities actually proscribed . . . ." United States v. Hall, 270 F. App'x at 126 (quoting Delfin-Colina, 464 F. 3d at 399).

Here, the officers initiated the stop of the BMW in which Small was a passenger based on § 4524 of the Motor Vehicle Code, which provides, in relevant part:

> (e) Sun screening and other materials prohibited.—
> (1)   No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle.

75 Pa. Cons. Stat. § 4524(e).

Courts have repeatedly found that if a car has tinted windows which do not permit an officer to see or view the inside of the vehicle through the windshield, side wing, or side windows, the officer has reasonable suspicion to conduct a traffic stop. See, e.g., Hall, 270 F. App'x at 126 (finding that officers' stop of vehicle based on illegal tint was supported by reasonable suspicion where they could not see the interior of vehicle even though the officers could not determine whether the tinted window had been installed by the manufacturer or were an aftermarket installation; that fact, from the perspective of a reasonable law enforcement officer on the scene, the window tint was sufficient to establish reasonable suspicion); United States v. Augustus, 590 F. Supp. 3d 767, 775 (E.D. Pa. Mar. 15, 2022) (finding reasonable suspicion where video footage showed that defendant's vehicle had dark tinted windows, and officers testified that they could not see into the vehicle); United States v. Smith, 575 F. Supp. 3d 542, 552 (E.D. Pa. 2021) ("The record establishes that both officers recalled Defendant's windows being tinted to such a degree of darkness that he officers could not see inside the car;" reasonable suspicion thus existed to believe the windows were unlawfully tinted, rendering the traffic stop lawful); United States v. Spry, No. 20-cr-84, 2021 WL 5925936, at *1 (E.D. Pa. Dec. 15, 2021) ("The officer gave some further details about the difficulty seeing inside the vehicle . . . . The Court also observed certain photographs of Defendant's vehicle. Based on the testimony and these

photographs, the Court finds that there was reasonable suspicion that the Defendant may have violated this section of the Motor Vehicle Code which warranted the officer approaching the vehicle and questioning defendant.").

A suppression hearing was held regarding the stop of the BMW in which Small was riding. At that hearing, Officer Dohan testified that the BMW had a dark tint on the windows and he was unable to see through the windows at all (N.T. 5/24/27, 15–16.) The Government also produced a photograph of the vehicle showing the tint on the window. (Id. at 17–19.) Subsequently, Officer Lesko testified that he observed a heavy dark tint on the front side windows of the BMW and he was not able to observe the interior of the car. (Id. at 64–65.) Based on this testimony, I found that both officers credibly observed illegal tinting on the windows that was a violation of the Motor Vehicle Code. (Id. at 95–96.) In turn, I declined to find any Fourth Amendment violation. (Id. at 98.)

Given the unrefuted evidence that the officers, at the time of traffic stop, observed illegal tinting on the BMW, there would have been no basis for appellate counsel to argue that there should have been tests or professional inspection to determine the extent of the tinting. As noted above, the reasonable suspicion analysis does not "deal with hard certainties, but with probabilities." Cortez, 449 U.S. at 418. Thus, even if professional inspection subsequently revealed that the BMW's window tinting was not violative of the Motor Vehicle Code, reasonable suspicion for the stop would still have existed. Because counsel is not ineffective for failing to raise a meritless claim, Plaintiff has not shown an entitlement to habeas relief.

An appropriate Order follows.